NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0000042
17-MAR-2015
08:05 AM**

NO. CAAP-13-0000042

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

RODNEY Y. SATO,
Plaintiff/Counterclaim-Defendant/Appellant/Cross-Appellee,
v.
WAHIAWA-CENTRAL OAHU HEALTH CENTER, INC., a Hawai'i non-profit
corporation, THE WAHIAWA HOSPITAL ASSOCIATION, a Hawai'i
non-profit corporation, and WAHIAWA GENERAL HOSPITAL, a
Hawai'i non-profit corporation,
Defendants/Counterclaim-Plaintiffs/Appellees/Cross-Appellants
and
JOHN DOES 1-10, JANE DOES 1-10, DOE ENTITIES 1-10,
Defendants

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 09-1-1087)

MEMORANDUM OPINION
(By: Nakamura, C.J., Foley and Reifurth, JJ.)

Plaintiff/Counterclaim-Defendant/Appellant/Cross-
Appellee Rodney Y. Sato (**Sato**) appeals from the Circuit Court of
the First Circuit's[1] (**circuit court**):

(1) "Order Granting Defendants The Wahiawa Hospital
Association and Wahiawa General Hospital's Second (2nd) Motion in
Limine to Preclude [Sato] From Introducing Evidence Relating to
Any Claim, Cause of Action or Theory of Liability Not Set Forth
in His Complaint" (**Order Granting Wahiawa Hospitals' Second
Motion in Limine**) filed April 3, 2012;

(2) "Findings of Fact, Conclusions of Law, and Order"
(**FOFs/COLs/Order**) filed August 27, 2012; and

---

[1]     The Honorable Rhonda A. Nishimura presided.

(3) "Final Judgment" filed October 12, 2012.[2]

Defendants/Counterclaim-Plaintiffs/Appellees/Cross-Appellants The Wahiawa Hospital Association (**WHA**) and Wahiawa General Hospital (**WGH**)[3] (collectively **Wahiawa Hospitals**) cross-appeals from the FOFs/COLs/Order and Final Judgment.[4]

On appeal, Sato contends the circuit court erred by: (1) "constraining its equitable powers contrary to the plain language of [the Hawai'i Rules of Civil Procedure (**HRCP**)] Rule 15(b)(1) by failing to recognize [Sato's] right to relief under the theory of breach of implied contract"; and (2) "dismissing [Sato's] claim for his unpaid/deferred fees and unreimbursed expenses by applying the wrong standard of proof for damages under the theory of breach of implied contract."

On cross-appeal, Wahiawa Hospitals contends the circuit court erred by: (1) finding that Sato "possibly" rendered services as an attorney for Wahiawa Hospitals and, relatedly, failing to find "that Sato (i) engaged in the practice of law while performing services for [Wahiawa Hospitals,] (ii) billed [Wahiawa Hospitals] for services including the practice of law

---

[2] Sato's notice of appeal in the instant case, filed January 23, 2013, does not appeal the Final Judgment, but rather appeals the circuit court's "First Amended Final Judgment" filed on December 26, 2012. The circuit court's First Amended Final Judgment reproduced the Final Judgment and dismissed Sato's claims against Defendant Wahiawa-Central O'ahu Health Center, Inc. The circuit court, however, lost jurisdiction to issue the First Amended Final Judgment when Sato filed an appeal from the Final Judgment (CAAP-12-0000997). See TSA Int'l Ltd. v. Shimizu Corp., 92 Hawai'i 243, 265, 990 P.2d 713, 735 (1999) ("Generally, the filing of a notice of appeal divests the trial court of jurisdiction over the appealed case."). Sato's appeal of the Final Judgment was timely filed on November 12, 2012.

In light of the confusion caused by the circuit court's error in issuing the First Amended Final Judgment without the authority to do so, this court is not deprived of appellate jurisdiction over Sato's appeal because "a mistake in designating the judgment . . . should not result in loss of the appeal as long as the intention to appeal from a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake." Ek v. Boggs, 102 Hawai'i 289, 294, 75 P.3d 1180, 1185 (2003) (citations and internal quotation marks omitted).

[3] WHA and WGH are Hawai'i non-profit corporations with a parent-subsidiary relationship. WGH provides medical services and is a wholly-owned subsidiary of parent corporation WHA. WHA provides WGH with "strategic support, funding and governance oversight management."

[4] Wahiawa Hospitals' notice of cross-appeal appeals the circuit court's First Amended Final Judgment, which the circuit court was without authority to issue, as noted supra note 2, and therefore this court infers that Wahiawa Hospitals cross-appeals the Final Judgment.

2

and (iii) acted in a manner that created a conflict of interest between himself and [Wahiawa Hospitals]"; (2) dismissing Wahiawa Hospitals' counterclaim based on its conclusion that Sato "did not breach his duty of loyalty to [Wahiawa Hospitals] such as to warrant a complete disgorgement of his fees and costs as a consultant/adviser"; (3) concluding "that the equitable remedy of 'complete disgorgement' was unwarranted"; and (4) awarding Sato $15,000 for monies owed to him for services during October 2006 and half of November 2006.

For the foregoing reasons, we affirm in part, vacate in part, and remand for proceedings consistent with this opinion.

## I.  BACKGROUND

### A.    The origin of the controversy

Sato joined the WHA Board of Directors (**WHA Board**) in the 1990s.  Between 1997 and 1999, the WHA Board discussed development of "the Pacific Health Center, a planned health care community built around a 210-acre medical campus that not only included the replacement hospital facility, but also integrated other ancillary health care providers."  In 1998, Wahiawa Hospitals proposed a joint venture to Caste & Cooke Homes Hawai'i, Inc. (**Castle & Cooke**) concerning the expansion of their health care facilities on Castle & Cooke's Koa Ridge properties, and Castle & Cooke exhibited interest in using the joint venture as a vehicle for the development of non-health related projects within its Koa Ridge Makai properties.

In early 1999, the WHA Board accepted Sato's resignation as a WHA Board member as part of a plan whereby Sato would become a paid adviser or consultant for the proposed Pacific Health Center Project, also known as the Koa Ridge Development Project (**Koa Ridge Project**).  Also in 1999, the WHA Board formed the Koa Ridge Committee, a committee consisting of WHA executive board members Edmund S.M. Whang, M.D. (**Dr. Whang**), chair of WGH; Randall M. Suzuka, M.D. (**Dr. Suzuka**), chair of Wahiawa-Central O'ahu Health Center (**WCOHC**)[5] and the Pacific

---

[5]    On February 1, 1999, WCOHC was incorporated as a nonprofit entity with its sole member being WHA and its board members consisting exclusively of WHA and/or WGH board members.  WCOHC's purpose was to plan/design/construct

(continued...)

Health Organization/Central Oʻahu Physician Organization; Rodger McCloskey (**McCloskey**), chair of both the WHA Board and Wahiawa Pacific Health Enterprises, Inc. Board; and Roy H. Doi (**Doi**), who served on the WHA Board and WGH Board from 1996 to 2001 and then again from 2004-2010.

According to the minutes of the January 21, 1999 WHA Special Board meeting, Sato described a corporate structure whereby the Pacific Health Community (**PHC, Inc.**) would be a for-profit entity encompassing 1,858 acres of Koa Ridge. WHA, "Central Oʻahu Physician Hospital Organization, Wahiawa Pacific Health Enterprises, and other equity partners and investors would participate in the health community development." The minutes further reflect that Sato envisioned that Wahiawa Pacific Health Enterprises, Inc. would be a for-profit entity and WCOHC would operate as a WHA-owned nonprofit entity, with PHC, Inc. serving as the overall developer entity along with several equity partners including WHA. The minutes reflect that the WHA Board passed motions supporting: (1) Wahiawa-Pacific Health Enterprises, Inc.'s development of a 190-310 acre health care center at Koa Ridge and Waiola and (2) PHC, Inc.'s development of the 1,858 acre health community at Koa Ridge and Waiola.

The minutes of a February 25, 1999 joint meeting between the WHA Executive Committee, WCOHC, WGH, and the Wahiawa Hospitals' Pacific Health Center Coordinating Committee (**PHCCC**)[6] reflect that Sato acknowledged his conflict of interest with regard to the "development/management agreement" and did not contribute to the discussion of or vote on WHA's agreements with consultants and land acquisitions related to development of the

---

[5](...continued)
and operate a patient-focused facility, to acquire or lease land for the new facility, and to acquire and install capital equipment for use in connection with the new facility.

[6]　　According to the Pacific Health Center January 2002 Business Plan, PHCCC was set up to coordinate between the [PHC], as the land developer, WCOHC, Pacific Health Organization/Central Oʻahu Physician Hospital Organization, WHA, WGH, and other entities, including future health providers to be located at the Pacific Health Center campus. PHCCC members included Sato, Dr. Suzuka, McCloskey, Dr. Whang, Doi, Roberts Leinau, and Hawaiʻi State Representative Marcus R. Oshiro. PHCCC was comprised of two entities, WHA and PHC, Inc.

Koa Ridge Project. The meeting minutes further reflect that while Sato was excused from the meeting, the Ad Hoc Building Committee voted to waive Sato's conflict of interest.

The WHA Executive Committee subsequently approved the development/management agreement with Sato, subject to terms and conditions to be negotiated and reviewed by WHA's attorneys. Wahiawa Hospitals requested a memorandum of understanding with Sato to address Sato's conflicts of interest, but none was ever signed.

On April 27, 1999, Sato faxed McCloskey and Dr. Whang a proposal to form WCOHC as the corporate entity to enter into a Professional Services Agreement (**PSA**) with Sato. The proposed PSA provided that, inter alia,

4. term 5 years with automatic option to renew for additional 5 year terms upon completion of milestones[;]

. . . .

6. projects development of new health care facilities, redevelopment of present hospital site and development of other real estate and business opportunities[;]

7. goals
a. acquire land
b. secure health partners and
c. secure financing for Diagnostic and Treatment Center and projects as prioritized in master plan phasing plan[;]

. . . .

8. milestones
a. prepare master plan/budget/timetable
b. acquisition/lease of land
c. securing partners
d. securing financing
e. acquiring [government] approvals
f. construction of project
g. initiate other projects[;]

. . . .

9. scope of services
draft, revise, adopt, implement/modify:
a. site selection/acquisition plan
b. development/master plan
c. partnering plan
d. financing plan
e. fundraising plan
f. community relations plan
g. government relations plan
h. government approvals plan
i. communications plan
j. construction plan
k. operations plan
l. maintenance plan
m. sales & marketing plan
n. overall development costs
o. overall development timetable[;]

. . . .

5

| 10. compensation | $10,000 base, $20,000 cap, deferred amounts to be paid upon project financing (plus reimbursements of all costs and expenses)[;] |
| | |
| | [Sato] will assist in developing additional funding sources |
| | |
| | [Sato] will also receive from WCOHC certain incentive fees . . . |
| | |
| | [Sato] will share 50% of all incentive fees from [other related corporate entities]. |

The PSA also provided that Sato would prepare exhibits to the PSA, including, Exhibit G, "Conflicts of Interest" that would consist in:

1. Sato's Years on WHA Boards

2. Sato's Past Conflict of Interest Forms

3. Sato's Resignation

4. Sato's Disclosure/Recusal

5. Board's Waiver Motion

Several drafts of the PSA were subsequently discussed and exchanged.  One PSA draft stated that Sato would receive a monthly fee of $10,000 based on a minimum of fifty hours per month but if Sato's time exceeded fifty hours in any given month, then additional compensation would be paid at the rate of $200/hour, and required Sato to submit detailed billings of his requested fees and detailed itemization of his costs.

While the WHA Board members alleged that they agreed to enter into a PSA with Sato based upon Sato's description of his qualifications as a former Deputy Attorney General for the State of Hawai'i and General Counsel to the State of Hawai'i Housing Authority, his experience working on "the development at Kapolei," and his familiarity "with the Land Use Commission [(LUC)] process and the legislative process[,]"  Sato alleged that in early 1999, he "made very clear to [McCloskey and Dr. Whang] that while I am a licensed Hawai'i attorney, I do not engage in the private practice of law and that WHA and WGH would have to continue to use its stable of private Hawai'i attorneys . . . to advise them along the way of the various legal aspects of the development."

On May 6, 1999, Sato filed articles of organization for

the establishment of a limited liability company, Pacific Health Care Development Company (**PHC Development**).

On November 1, 2000, PHC, Inc. was incorporated with Sato as President and a board member. McCloskey, Dr. Suzuka, Dr. Whang, and Roberts Leinau comprised the rest of PHC, Inc.'s Board of Directors. According to the Pacific Health Center January 2002 Business Plan, PHC, Inc. was created "to assist in the development of the 210-acre medical park at Koa Ridge" and was "responsible for facilitating and overseeing the organization of a qualified development team, the preparation of a master plan, the acquisition of the land, the government approvals and subdivision process, infrastructure development, and overall funding/financing of the [Koa Ridge Project]." According to the minutes of the October 17, 2006 WHA Special Board of Directors meeting, Dr. Suzuka explained that PHC, Inc. was switched from a non-profit to a for-profit organization in "2000/2001," with Sato listed as the agent, and that Sato claimed ownership of the company in 2006 even though it "was involuntarily dissolved in 2004." The record includes an undated, unsigned "Independent Contractor Agreement" between Sato and WHA, WGH, WCOHC, and PHC, Inc. that states Sato holds all the shares of PHC Inc., a for-profit corporation organized by Sato.

The minutes from a March 28, 2000 meeting reflect that the WHA Board discussed Sato's compensation at $200/hour with a base of $10,000 and a cap of $20,000 per month. Meeting minutes also reflect that a WHA Board member expressed concern over whether Sato's move from his role as a unpaid WHA Board member to a "highly paid" consultant constituted a conflict of interest. Other Board members responded that they viewed Sato's work on the project as "satisfactory," "comprehensive," and "the best value," and believed Sato was "the best person to take on this position . . . ." Sato responded that he

> realized that in Hawai'i there are no developers that would take the development process appropriately through the government process. Locally, there is no developer who is capable to do this. In order to find this type of developer, [WHA] would need to search outside Hawai'i. As a result, [WHA] would end up paying higher fees.

The meeting minutes reflect that the WHA Board member

who raised the conflict of interest issue was satisfied with the discussion and input regarding this issue. The minutes also reflect that PHCCC reviewed recommendations for the Pacific Health Center budget of $1.3 million, and that the WHA Board voted to "loan funds to the [WCOHC.]"

In an email addressed to "japatterson@fullbright.com" and dated August 25, 2000, Sato noted that the execution of his PSA and "development management agreement . . . would be a big step to making [him] feel comfortable about what [he was] doing on the project[,]" give his "wife and kids some comfort[,]" and give his "attorney less to worry about since he feels [Sato does] too much on a hand shake . . . ."

On February 25, 2001, Sato emailed Jeffrey Bensky (**Bensky**) of "Jones Lang LaSalle financing for JMB Associates" to ask him to help him "move these documents" along, in reference to the PSA, the development management agreement, and a development guidelines/memorandum of understanding. Sato also requested Bensky's assistance with obtaining opinion letters regarding the fairness of his proposed compensation; Sato wrote, "WHAT DO DEVELOPERS GET FOR DOING A PROJECT LIKE THIS."

On February 27, 2001, the WHA Board met and received reports from PHCCC. Meeting minutes reflect that PHCCC's update included the following item: "PROFESSIONAL SERVICES AGREEMENT FOR [SATO]: The agreement is to pay [Sato] $10,000/month and $200/hour. Any excess time incurred has been deferred until after there is income from the expansion project." Despite the absence of a written contract, WHA agreed to pay, and did pay, Sato compensation in the amount of $10,000 per month (plus general excise tax, approximately $10,416.70 per month), commencing March 1999, for his services under the yet to be executed PSA. An undated and unsigned "Independent Contractor Agreement" suggests that WHA, PHC, Inc. and Sato considered entering into an agreement separate from the PSA to compensate Sato for his "development management services," proposing to compensate Sato at a monthly rate of $10,000 with Sato "devoting no less than fifty (50) hours per month to the performance of the development management services . . . ."

On July 20, 2001, Castle & Cooke and WHA executed an Acquisition Agreement, which provided that Castle & Cooke owned a fee simple interest in the Koa Ridge property and WHA sought to acquire certain acreage, approximately 210 acres, for the future site of the Koa Ridge Project, with an eighty-acre first increment to be acquired and developed by WHA.

Sato, through PHC, Inc., prepared a Business Plan for the Pacific Health Center at Koa Ridge Makai and published it in January 2002. The Business Plan describes Sato as chair of PHC, Inc. and as "an attorney with 23 years experience in real estate financing and development."

On October 14, 2003, Sato sent an email to Milton Sagon, who was "WGH/WHA vice president development/fundraising" from 1997-2006, which stated that Sato could "put together a billing for all the hours" and it would take him "2 to 3 weeks working on it full time." Also in the email, Sato described two scenarios under which he would work either fifty to sixty hours or seventy to eighty hours per week, resulting in a deferred bill for 4.5 years of either $1,260,000 to $1,728,000 or $2,196,000 to $2,664,000.

On November 14, 2003, Sato entered into a "Consulting Services Agreement" with Jeffrey L. Lehrich (**Lehrich**) in which Lehrich's consulting firm agreed to prepare the Certificate of Need for the Koa Ridge Project for WHA. By email dated August 23, 2004, Sato further inquired into Lehrich's network of potential investors for the Koa Ridge Project.

In a letter dated January 27, 2004 and addressed to the WHA Board, WGH's chief financial officer, John Barragan III (**Barragan**) raised serious fiscal issues in connection with the Koa Ridge Project. Barragan wrote, "[s]ince virtually all resources of the WHA and WGH have been dedicated to the Koa Ridge project, WGH has suffered both operationally and financially."

On June 2, 2004, Barragan wrote to Sato requesting assistance with an audit and completed budget for the fiscal year of 2005. Barragan requested information about the expenses incurred and to be paid related to the Koa Ridge Project, and a copy of Sato's "Independent Contractor Agreement" or

"documentation of Board minutes approving [Sato's] services" if no such agreement existed.

"In or around July 16, 2004, suit was filed by WHA against Castle & Cooke in connection with the Acquisition Agreement. WHA was represented by the Bays Deaver law firm[,]" also known as the law firm of Bays Lung Rose & Holma. The cental dispute concerned whether Castle & Cooke breached terms of the Acquisition Agreement by failing to recognize WHA's exercise of its option to purchase an eighty-acre parcel that was to be dedicated to the Koa Ridge Project.

In a January 17, 2005 email, Sato informed Lehrich, "we need someone to take over the project now." In an email to Lehrich and carbon copying Dr. Suzuka and dated January 18, 2005, Sato informed Lehrich of his minimum requirements going forward:

1. $10,000.00 minimum retainer (till [sic] dirt starts moving and infrastructure construction financing is in place)

2. $20,000.00 monthly cap using $200.00 an hour (deferred till [sic] dirt starts moving and infrastructure construction financing is in place)

3. all hours over the $20,000.00 monthly cap to be defered [sic] till [sic] revenues come in from building leases

4. all costs & expenses to be reimbursed on a monthly basis within 10-days of billing

5. equity interest in the entity to hold the master lease "pacific health community, inc." and "pacific health center land company"

6. equity interest in the entity to hold the development rights "pacific health center land development company"

7. equity interest in the entity to develop the infrastructure "pacific health center infrastructure company"

8. equity interest in the entity to lease out the building pads "pacific health center building development company"

9. equity interest in the entity to manage and operate the "pacific health center"

10. chair title in pacific health community, inc., wahiawa-pacific health enterprises, inc., pacific health center, pacific health network, pacific health organization until the wahiawa hospital association/wahiawa-central oahu health center is reimbursed for all monies spent (wha to wcohc loan to be paid off) and the wahiawa hospital association wahiawa-central oahu health center "new hospital" is opened at the pacific health center

11. compensation package for all services rendered to all these various entities for a 5 year + 5 year period

10

12. /compensation [sic] package/equity interest/option to participate in other pacific health centers and in other developments/projects that co-developer/financing entity/ investor is involved in hawaii.

In an email dated January 19, 2005, Lehrich advised Sato that it was "too early in the process to commit to a compensation package until we have all the equity partners on line."  In reply, Sato wrote "i can only ask.  and if i don't ask, i don't get."  To which Lehrich replied, "You can shoot for the stars and land on the moon. I am pulling for you. Take care."

By letter dated February 5, 2005, AGS Investments, LLC (**AGS**)[7] informed Sato of AGS' intent to purchase PHC, Inc. and its subsidiaries and then assemble "a team that will develop, finance, construct, manage, operate, market, promote and lease the Pacific Health Center[.]"  AGS stated that it had assembled funding sources of up to approximately $10 million to fund the completion of the entitlement process, which included land use zoning and permitting processes.  Additionally, AGS (1) planned to replace the initial $4 million in initial purchase funds already provided by WHA for the first eighty acres; (2) secured an equity investor for an initial investment of up to $45 million to fund the Koa Ridge Project and several other real estate projects that AGS was developing; and (3) had a primary lending source with authority to lend up to $500 million to fund various parts of the Koa Ridge Project as needed.

The minutes from a November 15, 2005 WHA Board meeting reflect Dr. Whang commenting that "no further contact with the attorneys" on Sato's contract had occurred in the past three months and emphasized the importance of securing a services contract with Sato.  Dr. Suzuka reported for PHCCC and noted that Sato would publicize the Koa Ridge Request for Proposal (**RFP**) on November 18, 2005 and "it was expected that the developer would contribute $12 to $25 million with selection in the first week of January 2006."

---

[7]    By deposition dated December 13, 2011, Lehrich declared that he, along with other individuals, "put together" AGS as an investment vehicle for the Koa Ridge Project.

AGS prepared a Term Sheet, dated December 21, 2005, that set forth terms and conditions for the proposed development of the Koa Ridge Project. The Term Sheet reflects that Sato's compensation from AGS would consist in a prorated share of PHC, Inc. as settlement of his debt, a fee, reimbursements, incentives/bonuses, and benefits, all of which were "to be negotiated."

The minutes of a December 22, 2005 WHA Board meeting reflect Dr. Suzuka made a motion (which WHA Board carried) to have the Bays Deaver law firm create the "appropriate documents and contracts to formalize the relationships . . . [that] might include: a contract between WHA and Mr. Sato; a contract between WHA and PHC; [and] a contract between PHC and Mr. Sato[.]"

In a letter of interest to Sato dated January 31, 2006, AGS restated its interest in serving as the co-developer for the Koa Ridge Project and enclosed its Financing Plan and Development Plan. AGS stated that it "has its financing and development team in place and we are ready to move forward with the development of the Pacific Health Center."

A special joint meeting of the WHA/WCOHC/PHC boards convened on February 16, 2006. Sato updated the WHA Board on the status of the Koa Ridge RFP process and Castle & Cooke lawsuit mediation. Sato explained that three companies had submitted proposals to be co-developers of the Koa Ridge Project (AGS, Blanco Group, and PER Inc.) in response to the RFP. Sato observed that AGS submitted "the most complete financing proposal, but that Blanco and PER both had local ties and had a lot of construction experience." WHA Board members discussed Sato's contract and the relationship of the co-developer to Sato and PHC, Inc. Minutes reflect that Dr. Whang commented that Sato would receive $200 per hour with the outstanding balance due him when Koa Ridge land was conveyed to WHA. Dr. Suzuka clarified that Sato was the owner of PHC, Inc. and that contracts with Sato as consultant and the owner of PHC, Inc. would have to be completed before the land was conveyed. Dr. Suzuka further clarified that WHA's attorneys were working on the following agreements: (1) an Independent Contract with Sato; (2) a Master

Lease Agreement; (3) a Promissory Note (between WHA and PHC, Inc.); and (4) the Memorandum of Understanding/Master Agreement. The WHA Board approved a non-binding, tentative contract approval letter of January 21, 2006 with AGS and PHC, Inc., pending legal review and recommendation and subject to the completion of the contract between Sato and WHA.

By email on February 16, 2006, Sato requested that Karin L. Holma (**Holma**) of the law firm Bays Deaver, one of WHA's attorneys, review AGS' letter of interest dated January 31, 2006. Sato further emphasized that the "signing" with AGS would be subject to "everything" stated in his earlier February 16, 2006 email to Lehrich. In that February 16, 2006 email, Sato informed Lehrich that he would ask the WHA Board to motion to allow PHC, Inc. officers to sign an agreement with AGS, subject to:

> k. subject to [Sato's] professional services agreement/development management agreement/independent contractor agreement going into escrow,
>
> l. subject to master agreement/memorandum of understanding between [Sato] and [WCOHC]/the [WHA] going into escrow,
>
> m. subject to [Sato] final billing for fees and reimbursements going into escrow,
>
> n. subject to [PHC, Inc.]/[WCOHC]/the [WHA] final billing for fees and reimbursements going into escrow,
>
> o. subject to payment of all fees and reimbursements,
>
> p. subject to certain monies being deposited into escrow (exact amount of monies to be negotiated and finalized in agreement/co-development agreement)[.]

The February 16, 2006 WHA/WCOHC/PHC board meeting minutes reflect that a motion was carried to sign a "non-binding, tentative contract approval letter of January 21, 2006 by the PHC ([Sato]) subject to the conditions outlined in [Sato's] summary, pending legal review and recommendation and subject to the completion of the contract between [Sato] and the WHA."

In a letter dated March 29, 2006, AGS' legal counsel, Ronald E. Warnicke (**Warnicke**), wrote to Sato, Dr. Whang, and Dr. Suzuka. Warnicke explained that because WHA and PHC, Inc. had not produced a letter of intent nor any formal commitment, AGS was unable to complete their due diligence or to participate in mediation proceedings with Castle & Cooke to ensure that the

settlement would meet AGS' financial and legal requirements.[8]
Warnicke noted that WHA and PHC, Inc. "proceeded to continue to
shop [their] project" and had introduced a fourth group that did
not participate in the RFP process, "the Silversword
group . . . ." Warnicke acknowledged that AGS was still
interested in the Koa Ridge Project and proposed that further
discussions take place between Lehrich and "whomever your group
empowers to take the lead for the combined entities of
PHC/WGH/WHA" and imposed a deadline of March 31, 2006 "to move
ahead."

In a separate confidential letter also dated March 29,
2006, Warnicke wrote to Sato:

> AGS was selected as the co-developer and your respective
> Boards finally reviewed and consented to this on February
> 16th subject to an additional list of items, which included
> the legal review/consent of the attorneys. This never
> occurred and AGS could not do its legal and financial due
> diligence on the project.

On March 31, 2006, Lehrich emailed Sato, stating "the
sooner we can get our team out to conduct our due diligence and
work on the other pressing issues, the better" and asked Sato to
advise him of his availability. Sato replied that he and
"everyone else" can be available anytime.

Minutes from the April 11, 2006 WHA Board meeting note
that the contract with Sato was "still pending" and that Sato had
written to the Bays Deaver counsel summarizing the amount Sato
believed due him from WHA and PHC. Minutes referenced an email
from Sato that "clearly stated the amount he was charging [WHA]
and also identified $1.2 million to be paid by PHC[, Inc.]."
Board member Doi "questioned the content of [WHA's] contract
[with PHC, Inc.] and requested clarification of the services that
[Sato] provided."

In an email dated April 25, 2006, Sato wrote to
representatives of the Silversword Development Group to inquire
whether the group wanted to be part of the Koa Ridge Project.

---

[8]    On or about May 1, 2008, a confidential settlement agreement was
reached between Castle & Cooke and WHA, with Doi and Dr. Suzuka signing on
behalf of the WHA Board. Wahiawa Hospitals and Castle & Cooke agreed that
Wahiawa Hospitals would build a new hospital building and support facilities
on a 28-acre medical campus located at Koa Ridge.

The minutes of the May 16, 2006 WHA Board meeting reflect that Alan Ulrich (**Ulrich**), Chief Financial Officer of WGH, reported that the following areas of inquiry were pending for the fiscal 2005 audit: (1) Sato's liability; (2) the status of PHC, Inc. under Sato; and (3) Sato's justification for capitalized expenses for Koa Ridge.

At its May 16, 2006 meeting, the WHA Board received a report from Dr. Suzuka concerning his meeting with Sato, Holma, and others regarding Sato's PSA. Dr. Suzuka summarized Sato's work on behalf of WHA since 1999; "[p]er verbal agreement, [Sato] received $10,000 per month as base pay with deferred income for extra hours being charged at roughly $200 per hour up to a cap of $20,000 per month." Dr. Suzuka also reported that Sato had been presented with WHA's concerns: (1) "regarding possible issues of private inurement[;]" (2) that Sato should provide documentation for any deferred hours; (3) that Sato should account for any extra monthly hours by June 8, 2006; and (4) that WHA's Bays Deaver attorneys would be required to complete Sato's PSA. WHA officers expressed concern that PHC, Inc. had initially been a nonprofit entity wholly owned by WHA but became a for-profit entity owned by Sato and that Sato could not structure a deal with a co-developer on his own behalf while he was working on behalf of WHA.

Also at the May 16, 2006 meeting, the WHA Board Finance Committee noted that three developers were interested in the Koa Ridge Project, including "Carlton [Group] with whom PHC [Sato's company] had signed an exclusive agreement." The Finance Committee "recommended dissolving [PHCCC] because of issues of conflict of interest since [Sato] was both assisting in mediation as well as defining a development deal through his private corporation." Dr. Suzuka noted that these recommendations should be discussed with legal counsel, but that the impetus for the action was "PHC[, Inc.] was negotiating in its own best interest and had an inherent conflict of interest by being both 'judge' and 'contestant.'" Dr. Whang responded that PHCCC was important to maintaining continuity and protecting the interest of WHA. Thereafter, Dr. Suzuka suggested tabling the dissolution of

15

PHCCC.

At the July 6, 2006 WHA Finance Committee meeting, Dr. Suzuka stated that correspondence sent to Sato had not clearly specified the June 8, 2006 deadline for execution of his PSA and that he would "contact [Sato] and the attorney and give them a July 31, 2006 deadline for submitting invoices and finalizing the contract." The WHA Finance Committee approved a motion to establish a July 31, 2006 deadline for the signing of Sato's contract and his submission of documentation.

At the August 15, 2006 WHA Board meeting, Holma stated that Sato had not submitted invoices and documentation of his hours as requested. Meeting minutes note that Holma completed a preliminary version of the PSA but had not quantified the liability due Sato.

On September 11, 2006, Holma met with Sato to discuss settling his compensation "and he came up with $800,000 for himself, $1.2 million for PHC[, Inc.] and the rights to the project." After this meeting, Holma informed Drs. Suzuka and Whang that she had reached an impasse with Sato and that the WHA Board should find another attorney to draw up Sato's contract.

The minutes from the September 12, 2006 WHA Board meeting minutes reflect that: (1) Holma met with Sato to discuss his contract on September 11, 2006; (2) outstanding issues on WHA's 2005 audit included Sato's contingent liability and documentation for Sato's request for compensation from PHC and the corporate relationship between WHA and PHC; and (3) WHA could request an extension beyond September 30 to obtain approval for the transfer of a clear land deed to WHA, at which time Sato's services would cease.

In September 2006, the State of Hawai'i Attorney General's office (**Attorney General**) initiated investigations into Wahiawa Hospitals' Koa Ridge Project expenditures and PHC, Inc.'s role in particular in response to Ulrich lodging a complaint with the Attorney General alleging Sato was responsible for the misspending of Koa Ridge Project funds.

By subpeona dated September 26, 2006, the Attorney General commanded Sato to appear on October 5, 2006 "to be

examined under oath regarding an investigation of alleged financial mismanagement" and bring with him "books, records, papers, documents, including those electronically stored, or other objects" relating to, inter alia, the Koa Ridge Project or contracts or agreements between WHA, himself or PHC, Inc. or any other corporation or entity in which Sato is an officer, director or shareholder.

The minutes of the October 17, 2006 WHA Special Board of Directors meeting reflects that Holma summarized her review of all WHA Board meeting minutes from 1998 to that date concerning Sato's relationship to WHA Board. Per Holma's review, Sato was a WHA Board member who resigned to become a consultant for the Koa Ridge Project and WHA Board had agreed to pay Sato $10,000 per month for fifty hours of work and $200/hour for "anything over the 50 hours[,]" and payment was to be delayed to some point in the future when development started. Holma further summarized her efforts to date to finalize a contract with Sato and the "only problem" was Sato's compensation. The minutes also reflect that George Hetherington, counsel for Wahiawa Hospitals, instructed WHA Board members not to meet with Sato until "we find out what the Attorney General wants[.]"

By letter dated November 17, 2006 issued by WHA and signed by Dr. Suzuka, Sato was notified of WHA's decision to "terminate its relationship with [Sato] in regards to all activities that [Sato was] performing for WHA in the development of the Koa Ridge Project." WHA cited numerous grounds, in relevant part:

> WHA has made repeated attempts, including retaining several law firms, to negotiate a written contract with you to establish the scope of your activities, the basis for your compensation and other terms of the engagement. These efforts have failed to result in a written agreement, even though WHA throughout this process continued to fund significant expenses incurred on the project.
>
> Despite the expenditure of millions of dollars, which has had the result of severely crippling the financial health of [WGH], hardly any progress has been made in developing the new hospital [and] . . . the land for the new hospital campus has not yet been acquired[.] . . . It has become evident that your performance has failed to reach the requisite level of skill and care that meets commercially reasonable standards.
>
> . . . [The Attorney General's Office] has

> characterized WHA's relationship with you as involving potentially multifold failures of governance and breaches by the WHA board of directors of their duties of care and prudence, serious conflicts of interest and private inurement. The Attorney General has also expressed concern that WHA has spent $9.7 million on the Koa Ridge development without having a written agreement with you that spells out the rights and obligations of the parties and without any clear understanding of the roles of the multiple corporations that were formed and dissolved by you and the development rights surrendered or retained by WHA. . . .
>
> The Attorney General has indicated that a major step required in reforming WHA's governance failures is to terminate its relationship with you. . . .
>
> As a cconsequence of the termination of your services, WHA has also ceased making any further payments to you as of October 1. 2006. . . . Further, any claims for amounts alleged due or owing to you or to any third parties retained by you will be decided only after a full accounting and reconciliation of all expenditures made on the Koa Ridge [P]roject have been performed in cooperation with the Attorney General's office . . . .

It is undisputed that Wahiawa Hospitals paid Sato $10,000 plus general excise tax ($10,416.70) every month from March 1999 to September 2006 for a total of $947,919.70, and reimbursed Sato for certain expenses between February 10, 1999 and 2006, totaling $45,333.33.

## B. The circuit court proceedings

### 1. The pleadings

On May 8, 2009, Sato filed a complaint (**Complaint**) in circuit court[9] against Wahiawa Hospitals, WCOHC, and "doe" individuals and entities. Sato alleged that he entered into negotiations with defendants in 1999 that resulted in an express agreement; he "duly performed all material terms and conditions" of the agreement "or stood, and stands, ready, willing, and able to so performed [sic]"; defendants breached the agreement by wrongfully terminating Sato by letter dated November 17, 2006; as a result of the breach, the defendants owe Sato "$4,682,306.65 in fees plus $220,284.01 in unreimbursed out-of-pocket expenses"[10]; and the defendants "reasonably foresaw" that Sato would rely on the promises they made him and that "enforcement of the promises

---

[9] The case was initially assigned to the Honorable Victoria S. Marks and was reassigned to the Honorable Rhonda A. Nishimura on January 22, 2010.

[10] Sato later revised his "Fees Summary Chart" to reflect a claim of $4,095,429.77 (inclusive of the general excise taxes).

. . . are needed to avoid injustice." On May 29, 2009, Sato filed a "Notice of Dismissal Without Prejudice" as to WCOHC.

On June 1, 2009, Wahiawa Hospitals filed their answer and a counterclaim. Wahiawa Hospitals admitted that it entered into a verbal agreement with Sato, and that Sato performed certain services in accordance with that agreement, but alleged that a written and signed contract never resulted, and denied that Sato was wrongfully terminated or owed fees and unreimbursed out-of-pocket expenses. Wahiawa Hospitals' counterclaim (**Counterclaim**) included the following allegations:

> 6. Despite repeated attempts by [Wahiawa Hospitals] to negotiate a written contract, however, Sato never actually signed an agreed-upon written agreement defining the terms of his compensation, or any other terms of his relationship with [Wahiawa Hospitals].
>
> 7. Despite the absence of a written contract, Sato held himself out as the "Project Manager" and proceeded to deal with third parties as the agent of [Wahiawa Hospitals].
>
> 8. As a managing agent, Sato owed [Wahiawa Hospitals] the duty to act in the best interests of [Wahiawa Hospitals], including but not limited to a duty of reasonable care, a duty of loyalty, and a duty of disclosure.
>
> 8. [sic] Sato created or assumed control of certain corporate entities, using them for his own purposes in ways that were not explained to [Wahiawa Hospitals]. Sato now claims that he, and/or entities under his control, have certain rights with respect to the development project.
>
> 9. Over the period from 1999 through 2006, Sato was actually paid by [Wahiawa Hospitals] for thousands of hours of alleged work. In addition, Sato was reimbursed for various expenses that he had had purportedly incurred for the benefit of [Wahiawa Hospitals].
>
> 10. Over the period from 1999 through 2006, [Wahiawa Hospitals] paid out millions of dollars in purported expenses for the Koa Ridge [P]roject. Most of these expenses were incurred by Sato, who dealt with third parties and directed them to send invoices to [Wahiawa Hospitals].
>
> 11. Despite the millions of dollars expended, and the large sum paid to Sato, very little progress was actually achieved on the Koa Ridge [P]roject, and little of any value was accomplished by Sato. Indeed, Sato created disputes and problems, and his actions resulted in substantial delay, substantial costs, and serious problems for [Wahiawa Hospitals].
>
> 12. <u>Sato's actions included misrepresentations, negligence, improper self-dealing, wasting of [Wahiawa Hospitals'] funds, and breach of his oral agreement with Wahiawa Hospital</u>. The full extent of his wrongdoing is not yet known, but [Wahiawa Hospitals] believes that Sato's actions caused substantial damages.

(Emphasis added.)

Wahiawa Hospitals' Counterclaim sought:

1.    An award of damages against Sato in an amount to be shown at trial;

2.    An award against Sato of all costs and expenses incurred by Wahiawa [Hospitals] in this litigation, including but not limited to attorneys' fees;

3.    Awarding to [Wahiawa Hospitals] and against Sato such other and further relief as the Court may deem proper.

## 2.    Pre-trial statements

Sato

In his July 15, 2009 response to Wahiawa Hopitals' "First Request for Answers to Interrogatories and Production of Documents," Sato listed thirteen law firms as "third parties with which (or whom) [Sato] negotiated while acting as the agent of [Wahiawa Hospitals,]" and seven attorneys as "WHA attorneys."

By declaration dated March 22, 2012, Sato declared that he "succeeded in getting the 1999 Legislative [sic] and the Governor to approve extremely important bond financing. . . . Securing the bond financing further bolstered the credibility of the [Koa Ridge Project] . . . ." Sato further declared that he "was successful in negotiating WHA's acquistion of 210 acres of Castle & Cooke land at Koa Ridge."[11]  Sato also declared that he assisted WHA in various other ways, including but not limited to the coordination and management of meetings, workshops, conferences, developing agendas, development of videos, and petitioning the LUC in changing the Koa Ridge property from agriculture to urban.

Lehrich

By deposition dated December 13, 2011, Lehrich declared that he traveled to Hawai'i with his financial adviser and his attorney Warnicke to complete the due diligence for AGS, but that after he arrived, "[Sato] was sort of pushing us back and we didn't get to have the meetings that we were supposed to

[11]    Sato declared that his efforts resulted in the February 24, 2000 execution of the "Lease Pending Fee Purchase Agreement" between Castle & Cooke and WHA which provided that 210 acres of unimproved, unsubdivided land owned by Castle & Cooke on Koa Ridge would be designated as the future site of the Pacific Health Center.

have . . . and we ended up wasting our trip . . . ." Lehrich declared that Sato "wanted to have some stock and be a major player in the project," but Lehrich could not make these commitments to Sato on behalf of his investor. Lehrich further declared that in retrospect Sato refused to set up all the meetings and get things going. Lehrich declared that because Sato insisted on securing this "major role" in the company and refused to cooperate otherwise, and because Sato's authority to negotiate on behalf of various entities was unclear, AGS terminated discussions in Spring 2006.

### Doi

By deposotion dated February 7, 2012, Doi declared that the WHA Board understood that Sato's services would include financing, coordinating the building of, "and basically developing the Koa Ridge [P]roject or finding a developer for the Koa Ridge [P]roject." Doi declared that the Attorney General's inquiry into the Koa Ridge Project and their opinion of Sato incited the WHA Board to terminate the Koa Ridge Project and Sato's services sometime in or around November 16, 2006. Doi further declared that the Koa Ridge Project was terminated because it "was taking a very long time and didn't seem like it was getting anywhere, and we had spent the money[.]"

By declaration dated March 6, 2012, Doi declared that the Attorney General was "questioning why so much money had gone into the Koa Ridge project with so little to show for it. One of the areas of concern was the absence of any written agreement with Sato."

### Dr. Suzuka

By declaration dated March 14, 2012, Dr. Suzuka declared that during the initial discussions on the PSA, Sato stated that the Koa Ridge Project could be accomplished "by bringing in other organizations to participate, and that [Sato] could find investors and/or lenders who would supply the necessary funds." Dr. Suzuka also declared that he understood "that Sato would be using his experience in real estate development, including his legal knowledge and experience, on [Wahiawa Hospitals'] behalf" and that Sato's "legal knowledge and

experience was one of his primary qualifications for the job he was expected to do." Dr. Suzuka further declared that Sato "never accomplished the objective of obtaining an investor or developer to provide outside financing for the Koa Ridge expansion project."

Dr. Suzuka further declared that the WHA Board's main concerns about the Koa Ridge Project were: (1) the "substantial amounts paid to third parties, including . . . legal fees, travel expenses, and a variety of other costs and expenses incurred"; (2) that Sato had not "accomplished the objective of obtaining an investor or developer to provide outside financing"; and (3) Wahiawa Hospitals' expenditures on the "project exceeded $9 million dollars" while "the initial budget . . . was approximately $1.3 million dollars."

3. **Wahiawa Hospitals' Second Motion in Limine**

On March 19, 2012, Wahiawa Hospitals filed its "Second (2nd) Motion in Limine to Preclude [Sato] From Introducing Evidence Relating to Any Claim, Cause of Action or Theory of Liability Not Set Forth in His Complaint" (**Second Motion in Limine**). The Second Motion in Limine states that Wahiawa Hospitals "expressly withold[s its] consent to try any claim, cause of action or theory of liability other than those pleaded in [Sato's] Complaint[,] . . . [Wahiawa Hospitals] further expressly oppose[s] any attempt by [Sato] to amend his Complaint, and asserts for the record that [Wahiawa Hospitals does] NOT consent to any amendment by implication." (Emphasis in original.) In its memorandum in support of the motion, Wahiawa Hospitals argues that "any evidence [Sato] may introduce that is relevant to both pleaded and unpleaded theories of liability cannot be used to imply consent to trial of unpleaded theories of liability." (Emphasis in original.)

At the March 29, 2012 hearing on Wahiawa Hospitals' Second Motion in Limine, the circuit court explained that it read through Sato's Complaint and surmised that there were two causes of action - breach of contract and promissory estoppel. When asked by the circuit court if Sato had any opposition to the court's inclination to grant the motion based on its

22

identification of only two causes of action, Sato's counsel responded that he did not oppose the motion.

### 4.    Trial and the circuit court's rulings

The circuit court held a jury-waived trial between April 2 and April 18, 2012.

On April 3, 2012, the circuit court granted Wahiawa Hospitals' Second Motion in Limine and found that there was good cause to limit Sato's claims to breach of contract and promissory estoppel.  At the hearing on April 3, 2012, Sato testified that he filed a petition with the LUC which listed himself and Bill Yuen as the attorney for PHC, Inc., and appeared before the LUC in the relevant proceeding.  Sato conceded that appearing before the LUC as an attorney for a petitioner constitutes practicing law, that he billed Wahiawa Hospitals for his time before the LUC, and that at least part of the work he did for Wahiawa Hospitals constituted practicing law.

On April 4, 2012, Sato testified that in December of 2005, his negotiations with AGS on Sato's desired compensation package "became an obstacle" to Wahiawa Hospitals' ability to secure AGS' investment in the project.  Sato also testified that the amount expended on the Koa Ridge Project was approximately $4 to $5 million.

Sato testified that he initially entered into an oral agreement with WHA which provided that WHA owned 75% and Sato owned 25% of PHC, Inc. stock, and this percentage share would shift such that Sato would eventually own 75% of PHC, Inc.  Sato also testified that the WHA Board later discussed divesting WHA from having any interest in PHC, Inc.'s for-profit development activities.

On April 10, 2012, Sato testified that AGS decided not to invest in the Koa Ridge Project because WGH wanted to sell a skilled nursing facility to the Silversword group rather than AGS.

On April 12, 2012, the circuit court asked counsel for Wahiawa Hospitals, Ronald I. Heller (**Heller**), to clarify the damages sought by Wahiawa Hospitals' Counterclaim.

[HELLER]: . . . the exact amount is $947,919.70.  That is the total amount paid to Mr. Sato as fees inclusive of

general excise tax, and <u>what we are asking for is disgorgement and return of that amount. All of the other claims that we had initially talked about in terms of seeking to recover the entire nine million that was spent on Koa Ridge, we have decided not to pursue at this time</u>. And therefore, we believe . . . the only issue is[,] is [Sato] entitled to be paid for his hours or is he required to disgorge what he received for his hours.

. . . .

THE COURT: [Heller], with respect to the counterclaim seeking damages in the amount that you stated --

[HELLER]: Yes.

THE COURT: -- is it for contractual tort?

[HELLER]: No, Your Honor, it's based on violation of [Sato's] ethical duties as an attorney and agent based on his conflicts of interest, self-dealing, and --

THE COURT: Tort?

[HELLER]: Basically, yes.

. . . .

THE COURT: Let me turn this around so we can get to the heart of the matter. Are you claiming that he breached his ethical duty as an attorney, [Heller]?

[HELLER]: Among other things, yes.

THE COURT: Okay, when you say among other things, what other things --

[HELLER]: He breached --

THE COURT: -- on <u>the tort or contract</u>?

[HELLER]: <u>He breached his duty of loyalty as an agent</u> which is independent of acting as an attorney.

THE COURT: Understood.

(Emphases added.)

Heller reiterated that Wahiawa Hospitals' Counterclaim sought "damages in the form of disgorgement of the compensation paid to [Sato]. . . . [A] total of $947,919.70."

On August 27, 2012, the circuit court filed its FOFs/COLs/Order. The circuit court found that "during the project's six-year term[,]" Sato "rendered services [for Wahiawa Hospitals] in multiple capacities, as a consultant/adviser, as a co-developer, and possibly as an attorney [at a proceeding before the LUC] . . . ." The circuit court found that Sato "provided numerous services" "notwithstanding the failed negotiations by and between [Wahiawa Hospitals] and Castle & Cooke or [Wahiawa

Hospitals] and AGS . . . ."

The circuit court concluded that Sato and Wahiawa Hospitals entered an oral contract whereby Sato would render professional services "as a consultant/adviser to the WHA Board in connection with the Koa Ridge Project" and received a monthly compensation of $10,000. The circuit court further concluded that Wahiawa Hospitals' cessation of payments to Sato in September 2006, prior to Sato's termination in or around November 17, 2006, constituted a breach of the parties oral contract to compensate Sato $10,000 per month.

The circuit court concluded that Sato's promissory estoppel claim was without merit based on its finding that the discussions and negotiations that occurred between the parties as to other proposed terms and conditions, including deferred compensation and incentive fees, did not constitute a promise on behalf of Wahiawa Hospitals, and Sato's reliance on Wahiawa Hospitals' alleged promise was not reasonable.

In dismissing Wahiawa Hospitals' Counterclaim, the circuit court concluded:

> 13.    Although certain of [Sato's] activities raised questionable self-dealing issues, [Sato] expended considerable time and effort in his attempts to develop the Pacific Health Center. In hindsight, [Sato] may have undertaken a herculean project that was far more complicated in its scope and magnitude than his professed capabilities. WHA/WGH seeks a disgorgement of the entire amount of fees paid to [Sato], arguing that [Sato's] negotiations with a potential co-developer for his own compensation package separate and apart from any consultant/advisory services to WHA/WGH breached his duty of loyalty to WHA/WGH. [Sato] donning multiple roles may not have been in the best interest of all concerned; however, based upon the evidence presented, [Sato] did not breach his duty of loyalty to WHA/WGH such as to warrant a complete disgorgement of his fees and costs as a consultant/adviser. Therefore, the Counterclaim is dismissed.

(Emphasis added.)

On October 12, 2012, the circuit court filed its Final Judgment ordering Wahiawa Hospitals to pay Sato $15,000 for his services rendered under the parties oral contract during October 2006 and half of November 2006, denying Sato's request for other relief under his breach of contract claim, and dismissing Sato's promissory estoppel claim and Wahiawa Hospitals' Counterclaim.

On November 12, 2012, Sato filed a notice of appeal

from the circuit court's: (1) Order Granting Wahiawa Hospitals' Second Motion in Limine; (2) FOFs/COLs/Order; and (3) Final Judgment in appellate case no. CAAP-12-0000997. This court dismissed this case by "Order Approving Stipulation of Voluntary Dismissal of Appeal" filed March 13, 2013.

On December 26, 2012, the circuit court filed its First Amended Final Judgment, which mirrored the Final Judgment except that it also dismissed all of Sato's claims against WCOHC.

On January 23, 2013, Sato filed a notice of appeal from the circuit court's: (1) Order Granting Wahiawa Hospitals' Second Motion in Limine; (2) FOFs/COLs/Order; and (3) First Amended Final Judgment.

On February 5, 2013, Wahiawa Hospitals filed a notice of cross appeal from the circuit court's FOFs/COLs/Order and First Amended Final Judgment.

## II. STANDARDS OF REVIEW

### A. Motion in Limine

"The granting or denying of a motion in limine is reviewed for abuse of discretion." Miyamoto v. Lum, 104 Hawai'i 1, 7, 84 P.3d 509, 515 (2004) (internal quotation marks, citation, and ellipsis omitted). An abuse of discretion occurs if the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 114, 839 P.2d 10, 26 (1992).

### B. Findings of Fact

"[A] trial court's FOFs are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed." Chun v. Bd. of Trs. of the Employees' Ret. Sys. of the State of Hawai'i, 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005) (citations and internal quotation marks omitted) (quoting Allstate Ins. Co. v. Ponce, 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004)). "An FOF is also clearly erroneous when the record lacks substantial evidence to support the finding. . . . [S]ubstantial

evidence [is] credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Leslie v. Estate of Tavares, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999) (citations and internal quotation marks omitted).

## C.    Conclusions of Law

> A COL is not binding upon an appellate court and is freely reviewable for its correctness. [The appellate court] ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

Chun, 106 Hawai'i at 430, 106 P.3d at 353 (internal quotation marks, citations, and brackets in original omitted) (quoting Ponce, 105 Hawai'i at 453, 99 P.3d at 104).

## D.    Equitable Remedies

"The relief granted by a court in equity is discretionary and will not be overturned on review unless the circuit court abused its discretion by issuing a decision that clearly exceeds the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of the appellant." Aickin v. Ocean View Invs. Co., 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997) (internal quotation marks, citation, and brackets omitted).

### III.   DISCUSSION

A.    Sato's appeal is without merit because it is based solely on a theory of implied contract.

Sato contends the circuit court "erred in constraining its equitable powers contrary to the plain language [of] HRCP Rule 15(b)(1) by failing to recognize [Sato's] right to relief under the theory of breach of implied contract[,]" and implies that this court should vacate the circuit court's Order Granting Wahiawa Hospitals' Second Motion in Limine on this basis. Sato, however, provides no discernable argument concerning his appeal from the Order Granting Wahiawa Hospitals' Second Motion in Limine. Rather than arguing that the circuit court erred in granting Wahiawa Hospitals' Second Motion in Limine, Sato argues

27

that Wahiawa Hospitals breached an implied contract and implicitly consented to defending against Sato's breach of implied contract claims. Hawaii's appellate courts are "not obliged to address matters for which the appellants have failed to present discernible arguments." Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co., 116 Hawai'i 277, 288, 172 P.3d 1021, 1032 (2007) (citing Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(7)). HRAP Rule 28(b)(7) provides that "[p]oints not argued may be deemed waived."

Even if Sato's arguments relating to his appeal of the Order Granting Wahiawa Hospitals' Second Motion in Limine were discernable, we decline to consider his appeal of the order because Sato's counsel expressly declined opposition to Wahiawa Hospitals' Second Motion in Limine at the circuit court's March 29, 2012 hearing on the motion. See State v. Hoglund, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990). ("Generally, the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal.").

Moreover, Sato's argument that the circuit court ruled contrary to the plain language of HRCP Rule 15(b)(1) is without merit because the rule applies only when "issues not raised by the pleadings are tried by express or implied consent of the parties[.]"[12] HRCP Rule 15(b)(1) does not apply because Wahiawa Hospitals expressly withheld consent to try causes of action not pleaded in Sato's Complaint. See Hamm v. Merrick, 61 Haw. 470, 473, 605 P.2d 499, 502 (1980) (holding that HRCP Rule 15(b)(1) "provides that issues tried by express or implied consent [s]hall be treated as if raised in pleadings").

In addition, Sato's argument that his Complaint implicitly alleges the formation of an implied contract between the parties is without merit because with regard to the formation of a contract, the Complaint alleges that the parties entered

---

[12]    HRCP Rule 15(b)(1) provides, in pertinent part:

"(b) **Amendments during and after trial.**

(1) FOR ISSUES TRIED BY CONSENT. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

into negotiations that resulted in an agreement with specific terms and conditions, otherwise known as an express contract. See Wall v. Focke, 21 Haw. 399, 404 (Haw. Terr. 1913) (holding that express contracts are "those in which the terms of the agreement are openly uttered and avowed at the time of the making") (citation and internal quotation marks omitted). An implied contract, on the other hand, exists where the intention of the parties is not expressed, but an obligation is created by an agreement in fact that is implied or presumed from the parties' actions. Durette v. Aloha Plastic Recycling, Inc., 105 Hawaiʻi 490, 504, 100 P.3d 60, 74 (2004).

Moreover, even assuming arguendo that Sato's complaint raised a claim for breach of implied contract, the circuit court's findings refuted such a claim. The circuit court found that aside from Sato's $10,000 monthly compensation, Wahiawa Hospitals "had not agreed to any other sufficiently definitive or reasonably certain form of remuneration on a deferred or incentive basis. These financial terms were the subject of on-going discussions and negotiations." We conclude that the circuit court's findings, which were based on its credibility determinations and supported by substantial evidence, were not clearly erroneous. The circuit court's findings establish that the parties' actions did not indicate or provide the basis for the formation of an implied contract as to any compensation exceeding $10,000 per month. See Durette, 105 Hawaiʻi at 504, 100 P.3d at 74.

Accordingly, we affirm the circuit court's Order Granting Wahiawa Hospitals' Second Motion in Limine limiting Sato's Complaint to two causes of action – breach of contract and promissory estoppel, and we reject Sato's remaining arguments based on a theory of breach of implied contract.

B.  **Wahiawa Hospitals' cross-appeal**

1.  **The circuit court did not clearly err in finding that Sato "possibly" rendered services as an attorney.**

Wahiawa Hospitals contends the circuit court clearly erred in finding that Sato "rendered services in multiple capacities, as a consultant/adviser, as a co-developer, and

possibly as an attorney" because "substantial evidence exists in the record to support a factual finding that (i) Sato rendered services as an attorney to the [Koa Ridge] Project and (ii) that Sato billed the [Wahiawa Hospitals] for services including the practice of law." The circuit court did not clearly err in finding that Sato "possibly" rendered services as an attorney because although Sato rendered services in multiple capacities while working for Wahiawa Hospitals, and at least once billed Wahiawa Hospitals for services during which Sato referred to himself as an attorney, the record is ambiguous as to whether or not an attorney-client relationship existed between Sato and Wahiawa Hospitals.

The existence of an attorney-client relationship "turns largely on the client's subjective belief that it exists." DiCenzo v. Izawa, 68 Haw. 528, 536, 723 P.2d 171, 176 (1986) (citation and internal quotation marks omitted). See also Otaka, Inc. v. Klein, 71 Haw. 376, 383, 79 P.2d 713, 717 (1990) ("Legal consultation occurs when the client believes that he is approaching an attorney in a professional capacity with a manifest intent to seek professional legal advice." (citation and internal quotation marks omitted)).

Here, the record is ambiguous as to whether Wahiawa Hospitals viewed Sato as one of their attorneys who also acted as a consultant/advisor, or as an consultant/advisor with legal knowledge, skills, and experience. A draft of Sato's PSA with Wahiawa Hospitals, dated March 16, 1999, identifies Sato as a consultant on the Koa Ridge Project and specified the scope of Sato's work to encompass "consultive, non-legal, services . . . ." Sato testified that he "made it clear" that his role "was to be strictly related to the Pacific Health Center's developer and consultant [sic] and that [he] was not providing WHA and WGH any legal services." However, WHA Board member McClosky declared that the WHA Board agreed to enter into a PSA with Sato based in part upon Sato's description of his qualifications as a former Deputy Attorney General for the State of Hawai'i and General Counsel to the State of Hawai'i Housing Authority, and that they found Sato's "legal knowledge and

30

experience [to be] one of his primary qualifications for the job he was expected to do." The Koa Ridge Business Plan, which was prepared by Sato, describes Sato as chair of PHC, Inc. and "an attorney with 23 years experience in real estate financing and development." Also, Sato testified that he billed Wahiawa Hospitals for his time spent filing a petition with the LUC and appearing before the LUC as an attorney in a proceeding for the Koa Ridge Project. The record also suggests that Wahiawa Hospitals employed several attorneys from different Hawai'i law firms to serve only as attorneys for the Koa Ridge Project.

Therefore, the circuit court's finding that Sato "possibly" rendered services for Wahiawa Hospitals as an attorney is not clear error because although Wahiawa Hospitals alleges that it viewed Sato as one of its attorneys, the record is ambiguous as to whether an attorney-client relationship existed between Sato and Wahiawa Hospitals.

**2. Although complete disgorgement is not warranted, the circuit court erred in dismissing Wahiawa Hospitals' Counterclaim on its conclusion that Sato did not breach his duty of loyalty "such as to warrant" complete disgorgement.**

In dismissing Wahiawa Hospitals' Counterclaim in its FOFs/COLs/Order the circuit court concluded:

> 12. The Counterclaim filed by [The Wahiawa Hospitals] assert[ed] that . . . .
>
> > 12. Sato's actions included misrepresentations, negligence, improper self-dealing, wasting of Wahiawa [Hospitals'] funds, and breach of his oral agreement with Wahiawa [Hospitals].
>
> > 13. Although certain of [Sato's] activities raised questionable self-dealing issues, [Sato] expended considerable time and effort in his attempts to develop the Pacific Health Center. In hindsight, [Sato] may have undertaken a herculean project that was far more complicated in its scope and magnitude than his professed capabilities. WHA/WGH seeks a disgorgement of the entire amount of fees paid to the [Sato], arguing that [Sato's] negotiations with a potential co-developer for his own compensation package separate and apart from any consultant/advisory services to WHA/WGH breached his duty of loyalty to WHA/WGH. [Sato] donning multiple roles may not have been in the best interest of all concerned; however, based upon the evidence presented, [Sato] did not breach his duty of loyalty to WHA/WGH such as to warrant a complete disgorgement of his fees and costs as a consultant/adviser. Therefore, the Counterclaim is dismissed.

(Emphasis added.)

31

Wahiawa Hospitals argues that the circuit court erred by "confus[ing] the issue of whether Sato is <u>liable</u> to [Wahiawa Hospitals] as a result of his breach of the duty of loyalty with the issue of whether [Wahiawa Hospitals] was entitled to the <u>remedy</u> of complete disgorgement." (Emphasis in original.) Wahiawa Hospitals believes that Sato created a conflict of interest by "trying to negotiate a deal <u>for himself</u> with potential investors or co-developers at the same time that he was negotiating with those same potential investors or co-developers as an agent of [Wahiawa Hospitals]." (Emphasis in original.) Wahiawa Hospitals alleges that it "wanted to have a written Memorandum of Understanding to address the conflict, but no such agreement was ever signed." Wahiawa Hospitals contends the record reflects that Sato's involvement "was hindering good faith negotiations between AGS and [Wahiawa Hospitals]." Wahiawa Hospitals believes complete disgorgement of Sato's compensation is the appropriate remedy because Sato forfeited his right to compensation when he breached his duty of loyalty to Wahiawa Hospitals. Wahiawa Hospitals argues that the circuit court, "<u>at a bare minimum</u>, was required to conclude that Sato breached his duty of loyalty to [Wahiawa Hospitals] and enter judgment as to that counterclaim in favor of [Wahiawa Hospitals] – <u>even if the ultimate award was only for partial disgorgement or some form of nominal damages</u>." (Emphasis in original.)

Sato argues "that the creation of [PHC, Inc.] merged the interests of [Wahiawa Hospitals] and Sato in the Koa Ridge Project, and under the circumstances Sato's attempt to negotiate a compensation package for himself in conjunction with the sale of [Wahiawa Hospitals'] equity interest in [PHC, Inc.] does not amount to an actionable breach of loyalty or conflict of interest because [Wahiawa Hospitals'] effectively consented to Sato's potential conflict of interest." Sato alleges that from the earliest stages of the Koa Ridge Project, he disclosed to Wahiawa Hospitals the potential for his role as consultant/advisor to conflict with his desire to serve "as a land developer on the project through his company, [PHC Development]" and that Wahiawa Hospitals waived the potential conflict of interest during its

February 25, 1999 and March 28, 2000 board meetings. Sato further alleges that AGS decided not to invest in the Koa Ridge Project because Wahiawa Hospitals "insisted on selling its skilled nursing operation as a separate package to another developer," not because Sato negotiated for a specific compensation package in exchange for AGS' agreement to invest. Sato also alleges that at "all times relevant hereto, Sato kept [Wahiawa Hospitals] fully informed of all of his activities and communications through weekly and sometimes biweekly meetings on the project." Sato argues that "[u]nder the circumstances, Sato's discussions with AGS regarding a compensation package for himself in conjunction with his attempt to negotiate a cash investment in the project to cover [Wahiawa Hospitals'] expenses for the project clearly served the interests of [Wahiawa Hospitals] as well as Sato, and was done with [Wahiawa Hospitals'] full knowledge and consent."

3. **Sato breached his duty of loyalty to Wahiawa Hospitals.**

The parties do not dispute that Sato agreed to act and did act as Wahiawa Hospitals' agent for the Koa Ridge Project, and as such, Sato was required to act solely for Wahiawa Hospitals' benefit in all matters connected with the Koa Ridge Project unless otherwise agreed. See Restatement (Second) of Agency § 387 (1958) ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency."). Sato testified that in December of 2005, his negotiations with AGS on Sato's desired compensation package "became an obstacle" to Wahiawa Hospitals' ability to secure AGS' investment in the project. Sato breached his duty of loyalty to Wahiawa Hospitals by negotiating for his own benefit because the record does not indicate that Wahiawa Hospitals agreed to such conduct.

The minutes from the February 25, 1999 Joint Meeting reflect that Sato acknowledged his conflict of interest with regard to the "development/management agreement," recused himself, and the Wahiawa Hospitals Ad Hoc Building Committee voted to waive Sato's conflict of interest. The minutes from a March 28, 2000 meeting reflect that a WHA Board member expressed

concern over whether Sato's move from his role as a unpaid WHA Board member to a "highly paid" consultant constituted a conflict of interest. Other Board members responded that they viewed Sato's work on the project as "satisfactory," "comprehensive," and "the best value," and believed Sato was "the best person to take on this position[.]" Sato explained that he "decided to take on [the Koa Ridge Project] 'vision'" because if he did not take the position, Wahiawa Hospitals would need to find a developer outside Hawai'i, and "would end up paying higher fees." Meeting minutes reflect that the WHA Board member who raised the conflict of interest issue was satisfied with the discussion and input regarding this issue.

The WHA Board meeting minutes do not establish that the parties "otherwise agreed" that Sato could act to benefit himself while acting as Wahiawa Hospitals' agent when such acts had the potential to conflict with the interests of Wahiawa Hospitals. At most, the board minutes reflect that in the early stages of the project, the WHA Board determined that Sato was well suited for the consultant/advisor position even though a conflict of interest was identified.

We conclude that the circuit court erred by dismissing Wahiawa Hospitals' Counterclaim because Sato breached his duty of loyalty to Wahiawa Hospitals.

**4. Wahiawa Hospitals is not entitled to disgorgement.**

Wahiawa Hospitals' argument that disgorgement is an appropriate remedy in the instant case is without merit. "Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment . . . ." S.E.C. v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989). For example, in Hawaiian Ass'n of Seventh-Day Adventists v. Wong, 130 Hawai'i 36, 305 P.3d 452 (2013), the Hawai'i Supreme Court held that on remand, the plaintiff-lessor may be entitled to disgoregment damages if the fact-finder finds that the defendant-lessee earned profits in violation of the lease. Id. at 49, 305 P.3d at 465. Wahiawa Hospitals argues that Sato breached his duty of loyalty, not that Sato was unjustly enriched or profited from the breach.

An agent who breaches a duty owed to his principal is

34

subject to liability for loss caused to the principal by such a breach.  See Restatement (Second) of Agency § 401 (1958).  "Where compensatory damages are not computable, although a breach of contract is proven, the only award that can be made is nominal damage."  Ferreira v. Honolulu Star-Bulletin, Ltd., 44 Haw. 567, 578, 356 P.2d 651, 657 (1960).  To recover more than nominal damages,[13] the plaintiff's loss must be established "with reasonable certainty.  The damages must be susceptible of ascertainment in some manner other than by mere speculation, conjecture, or surmise."  Ferreira, 44 Haw. at 576, 356 P.2d at 656.

On remand, the circuit court shall determine whether Wahiawa Hospitals is entitled to damages for Sato's breach of his duty of loyalty.

5. **The circuit court did not err in awarding Sato $15,000 as monies owed to him for services during October 2006 and half of November 2006.**

Wahiawa Hospitals contends that the circuit court erred in awarding Sato $15,000 for his work for Wahiawa Hospitals during the month of October 2006 and half of November 2006 because Sato's Complaint did not seek such damages.  Wahiawa Hospitals argues that Sato's "Fee Summary Chart" "expressly disclaimed" these damages.

Sato argues that the Fee Summary Chart "is at best vague and ambiguous as to whether Sato knew he was relinquishing his right to compensation for services rendered in October and November, 2006."

Here, it is undisputed that Wahiawa Hospitals and Sato entered into an oral contract whereby Wahiawa Hospitals agreed to pay Sato $10,000 per month for services related to the Koa Ridge Project, Wahiawa Hospitals did not pay Sato after September 2006, and Sato received his letter of termination on November 17, 2006.  We therefore hold that the circuit court did not abuse its discretion in awarding Sato $15,000 in damages for Wahiawa

---

[13]    "Nominal damages are a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages."  Restatement (Second) of Torts § 907 (1979).

Hospitals' breach of the parties' oral contract.

## IV. CONCLUSION

We vacate the Circuit Court of the First Circuit's August 27, 2012 "Findings of Fact, Conclusions of Law, and Order" with respect to Conclusion of Law 13 and its October 12, 2012 "Final Judgment" with respect to the entry of judgment in favor of Sato on Wahiawa Hospitals' counterclaim, and we remand this case for further proceedings consistent with this Memorandum Opinion. We affirm the circuit court in all other respects.

DATED: Honolulu, Hawai'i, March 17, 2015.

On the briefs:

Eric A. Seitz
Della A. Belatti
Sarah R. Devine
(Law Office of Eric A. Seitz)
for Plaintiff/Counterclaim-
Defendant/Appellant/Cross-
Appellee.

Ronald I. Heller
Brian W. Tilker
(Torkildson, Katz, Moore,
Hetherington & Harris)
for Defendants/Counterclaim-
Plaintiffs/Appellees/Cross-
Appellants.

Chief Judge

Associate Judge

Associate Judge